**FILED
CLERK**

3:27 pm, Jan 29, 2020

**U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
EDWARD L. CLARK,

                Plaintiff,      **MEMORANDUM OF
                                               DECISION & ORDER**
        -against-              2:16-cv-02503 (ADS)(SIL)

THE TRAVELERS COMPANIES, INC.

                Defendant.
----------------------------------------------------------X

**APPEARANCES:**

**Clark's Laws PC**
*Co-Counsel for the Plaintiff*
57 West Main Street Suite 220
Babylon, NY 11702
        By:    Adam Crowley, Esq.,
                 James E. Clark, Esq., Of Counsel.

**Blodnick, Fazio & Associates, P.C.**
*Co-Counsel for the Plaintiff*
1325 Franklin Avenue, Suite 375
Garden City, NY 11530
        By:    Edward K. Blodnick, Esq., Of Counsel.

**Lennon Murphy & Lennon LLC**
*Co-Counsel for the Defendant*
420 Lexington Avenue Suite 300
New York, NY 10170
        By:    Charles E. Murphy, Esq., Of Counsel.

**Wilson Elser Moskowitz Edelman & Dicker LLP**
*Co-Counsel for the Defendant*
1010 Washington Blvd
Stamford, CT 06901
        By:    Anne Casey Le Vasseur, Esq., Of Counsel.

**SPATT, District Judge**:

        Plaintiff Edward L. Clark (the "Plaintiff") brings this action against defendant The

Travelers Insurance Companies, Inc. (the "Defendant") for breach of contract and violation of

1

N.Y. Ins. Law § 2601, stemming from the Defendant's denial of his claim for insurance funds to cover damages to his yacht under a marine insurance policy.

Presently before the Court are motions by the Defendant: (1) to bifurcate the Plaintiff's breach of contract claim from his statutory claim pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P." or "Rule") 42; (2) for summary judgment pursuant to Rule 56; and (3) to preclude expert testimony by Roy Scott ("Scott") pursuant to Federal Rule of Evidence ("Fed. R. Evid." or "Rule") 702.

For the following reasons, the Court denies the motion to preclude, grants the motion for summary judgment, and denies the motion to bifurcate as moot.

## I. BACKGROUND

The Defendant, a marine insurer, issued an insurance policy (the "Policy") to the Plaintiff, a vessel owner, covering a 36-foot 1984 Topaz convertible (the "Vessel") for the policy period from April 24, 2014 to April 24, 2015.

On February 23, 2015, the Vessel sank at its dock, a private slip connected to the Plaintiff's residence, becoming completely submerged except for its tower. Although the Plaintiff had intended to keep the interior spaces of his boat at temperatures above freezing through the use of portable electric space heaters, which were connected to a shore power cord, those heaters shut off when the Plaintiff's property lost electricity. Without antifreeze in the air conditioning system, its sea strainer froze, expanded, and cracked after the property's electricity went out because the space heaters were no longer energized.

Also on February 23, 2015, the Plaintiff notified the Defendant of the sinking. The Defendant assigned Kevin Weisensee ("Weisensee"), a claim specialist, to the Plaintiff's claim.

Weisensee took a statement from the Plaintiff, after which the Defendant assigned marine surveyor Andrew McGowan, a staff surveyor, to conduct a post-loss investigation.

On February 24, 2015, McGowan spoke to the Plaintiff on at least two occasions. Also on February 24, 2015, a third-party pumped the water from the Vessel and refloated it. However, because the boat was surrounded by ice, it couldn't immediately be towed to Babylon Marine. McGowan advised the Plaintiff that he would inspect the Vessel the next day at either its slip or at Babylon Marine depending upon whether the Vessel could be safely towed.

On February 25, 2015, McGowan inspected the refloated vessel at Babylon Marine and determined that the sinking had been caused by the Plaintiff's failure to winterize the air conditioning system with antifreeze. More specifically, McGowan determined that the Vessel sank because of the freezing, expansion and cracking of the plastic sea strainer housing on the raw water inlet side of the air conditioning system. The cracked plastic sea strainer housing allowed seawater to flood into the boat through an open through-hull valve, *i.e.*, seacock.

During his inspection, McGowan operated the through-hull valve associated with the air conditioner's raw water intake. When McGowan opened that valve, he observed seawater flowing through the cracked plastic sea strainer housing and into the boat. The flow of seawater stopped when McGowan closed the valve. The through-hull valve leading to the sea strainer had been left open at the time of the sinking, and later closed by the salvor when the boat was refloated to prevent it from sinking a second time.

On February 27, 2015, Weisensee sent Clark a reservation of rights letter.

On March 13, 2015, after the Defendant completed its claims investigation, Weisensee sent the Plaintiff a letter denying coverage.

3

On April 27, 2016, the Plaintiff filed a complaint in the New York Supreme Court for the County of Suffolk asserting claims for (1) breach of contract and (2) violation of N.Y. Ins. Law § 2601.

On May 17, 2016, the Defendant removed the case pursuant to 28 U.S.C. § 1446.

On January 11, 2019, the Defendant moved to bifurcate the breach of contract and New York Insurance Law claims.

On April 17, 2019, after receiving letters from the parties, the Court held a pre-motion conference regarding a contemplated motion for summary judgment by the Defendant, authorized summary judgment motion practice, and set a briefing schedule.

On May 17, 2019, the Defendant filed its motion for summary judgment.

On May 22, 2019, the Defendant filed its motion to preclude the expert testimony of Scott.

## II. DISCUSSION

**A. AS TO THE MOTION TO PRECLUDE.**

The Plaintiff retained Scott, a marine surveyor, who opined: that the Vessel was not in navigation, and was in full compliance with the Policy's lay-up warranty; the proximate cause of the Vessel sinking was a loss of electrical power; and the Defendant failed to perform a complete and thorough investigation. The Defendant seeks to preclude Scott's testimony because: (1) he is not qualified; (2) his opinions are not based on sufficient facts or data; (3) his opinions are not based on reliable principles and methods; and (4) his opinions would be unfairly prejudicial and misleading.

Notwithstanding the Plaintiff's failure to oppose the Defendant's motion, the Court does not believe there is a sufficient basis for precluding Scott's testimony.

### 1. The Legal Standard.

Prior to the Supreme Court's interpretation of Rule 702 in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the test to determine if scientific evidence was admissible at trial was whether the evidence was generally accepted as reliable within the relevant scientific community. *See Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923). *Daubert*, however, held that the *Frye* test was superseded by the adoption of the Federal Rules of Evidence, which included a liberal relevance standard. Rule 401 states that evidence is relevant if it has any tendency to make the existence of any fact of consequence to the action more or less probable. Fed. R. Evid. 401.

Rule 702, entitled "Testimony by Experts," states that: "[i]f . . . scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," "a witness who is qualified as an expert by knowledge, skill, experience, training, or education, may testify in the form of an opinion or otherwise." Fed. R. Evid. 702. Examining Rule 702, *Daubert* provides a flexible analysis to guide trial courts in determining whether proffered submissions of scientific evidence are admissible.

The Supreme Court emphasized the "flexibility" that should guide the trial court when making a determination of the admissibility of scientific evidence and stressed that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786 (internal citations omitted); *but cf. Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) ("A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible. 'The judge should only exclude the evidence if the flaw is large enough that the

expert lacks good grounds for his or her conclusions.'" (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 746 (3d Cir. 1994))).

When faced with the prospect of expert testimony:

> the trial judge must determine at the outset, pursuant to Rule 104(a) whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

*Daubert*, 509 U.S. at 592–93, 113 S.Ct. 2786 (internal citations omitted).

The Supreme Court provided a list of factors for a trial court to consider when making this determination, but emphasized that "we do not presume to set out a definitive checklist or test." *Id.* at 593, 113 S.Ct. 2786. The four factors include: (1) whether the theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error in the case of a particular scientific technique; and (4) whether the theory or technique is generally accepted within the relevant scientific community. *Id.*; *see generally Zuchowicz v. United States*, 140 F.3d 381 (2d Cir. 1998); *Iacobelli Constr., Inc. v. Cty. of Monroe*, 32 F.3d 19 (2d Cir. 1994). These factors are not considered exhaustive and the Supreme Court noted that other relevant factors may be reviewed. *Daubert*, 509 U.S. at 593, 113 S.Ct. 2786.

Other factors include: (1) whether the proposed expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field," *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); (2) whether the expert's field lacks reliability, *Id.* at 151, 119 S.Ct. 1167; (3) whether the testimony comes from research conducted independent of litigation, *see Daubert v. Merrell Dow Pharm.*, 43 F.3d 1311, 1317 (9th Cir. 1995); (4) whether the proposed expert has considered additional

explanations in his analysis, *see Ambrosini v. Labarraque*, 101 F.3d 129, 140 (D.C. Cir. 1996); and (5) the "non-judicial uses to which the scientific technique are put." *United States v. Downing*, 753 F.2d 1224, 1239 (3d Cir. 1985).

While the four guidelines enunciated in *Daubert* "leave in place the 'gatekeeper' role of the trial judge in screening such evidence," *General Elec. Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), the Second Circuit in *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038 (2d Cir. 1995) held that:

> [t]rial judges must exercise sound discretion as gatekeepers of expert testimony under *Daubert*. [The Appellant], however, would elevate them to the role of St. Peter at the gates of heaven, performing a searching inquiry into the depth of the expert witness's soul—separating the saved from the damned. Such an inquiry would inexorably lead to evaluating witness credibility and weight of evidence, the ageless role of the jury.

*Id.* at 1045.

In sum, the Federal Rules of Evidence, the Supreme Court's decision in *Daubert*, and the guidance of the Second Circuit require this Court, when making a decision as to whether to admit expert testimony to: (1) determine whether the witness is qualified to testify as an expert by examining the witness's educational or experiential qualifications in the relevant field; and (2) using the non-exhaustive factors enunciated as guidelines, determine whether the proposed testimony will involve the relevant specialized knowledge that will assist the trier of fact to understand or to determine a fact in issue. While the focus of the Court's inquiry must remain on the methodology rather than the conclusions, the Court is not obligated to accept conclusions that do not flow from the facts and methodologies used. *Amorgianos*, 303 F.3d at 266 (internal citations omitted).

Following *Daubert*, it has become a well-accepted principle that Rule 702 is to be interpreted using a liberal standard of admissibility, which is a departure from the more

restrictive *Frye* standards. *See Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005). However, despite a more permissive approach to expert testimony, the Court must ensure that "any and all scientific [or other expert] testimony or evidence admitted is not only relevant but reliable." *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786.

Six years after Daubert, in *Kumho Tire Co. v. Carmichael*, the Supreme Court clarified that, whether a witness's area of expertise was technical, scientific, or more generally "experience-based," Rule 702 required the district court to fulfill the "gatekeeping" function of "mak[ing] certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." 526 U.S. at 152, 119 S.Ct. 1167.

Also, as stated above, the requirement of "reliability" is extremely important and requires a clear analytical connection between the expert's methodology and his conclusions. So that *Daubert* and Rule 702 "mandate the exclusion of . . . unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266. The Supreme Court assigned to the trial judge the task of ensuring that an expert's testimony rests on a reliable foundation and is relevant to the issues in the case. The trial judge has latitude in deciding how to test an expert's reliability and whether the expert's relevant testimony is reliable.

2. **As to Scott's Qualifications.**

The Defendant argues that Scott is unqualified because he admitted in his deposition that he is not an expert in claims adjusting and lacks professional experience in decommissioning boats.

As stated above, whether a particular witness qualifies as an expert is within the province of the trial judge. *See TC Sys., Inc. v. Town of Colonie*, 213 F.Supp.2d 171, 175 (N.D.N.Y.

8

2002). "In considering a witness' practical experience and educational background as criteria for qualification, the threshold question is whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth." *Hilaire v. DeWalt Indus. Tool Co.*, 54 F.Supp.3d 223, 235–36 (E.D.N.Y. 2014) (internal citations omitted). Trial courts review the totality of an expert's qualifications in making this determination. *Argonaut Ins. Co. v. Samsung Heavy Indus. Co.*, 929 F.Supp.2d 159, 168 (N.D.N.Y. 2013). A "broad range of knowledge, skills and training" are used to review an expert's general qualifications. *In re Paoli*, 35 F.3d at 741. "An expert need not be precluded 'from testifying merely because he or she does not possess experience tailored to the precise product or process that is the subject matter of the dispute.'" *Hilaire*, 54 F.Supp.3d at 236 (quoting *Yaccarino v. Motor Coach Indus., Inc.*, No. 03-cv-4527, 2006 WL 5230033, at *9 (E.D.N.Y. Sept. 29, 2006)).

Scott unquestionably meets this standard. He has over 30 years of experience as a Marine Inspector, Marine Investigator, Marine Surveyor, Claims Adjuster and expert witness. ECF 55-1 at 9. His background also includes conducting vessel claims surveys for insurance companies. The fact that he has never worked for an insurance company as a claims adjustor or professionally decommissioned boats is immaterial. His expert report opines on whether the Vessel was in navigation at the time of the incident; the proximate cause of the damage to the Vessel; and the adequacy of the marine survey conducted by the Defendant. He certainly possesses background, training, and experience in these subject matters, notwithstanding his lacking the particular experience noted by the Defendant.

Put another way, Scott has expertise in investigating insurance claims and damage to marine vessels, which makes him qualified to opine on the condition in which the Plaintiff kept the Vessel before the incident and whether the Defendant conducted a survey sufficient to

correctly identify the cause of the damage to the Vessel. There is no reason why he would need a specific background in claims adjustment or professional winterization to make those assessments.

Therefore, the Court denies the Defendant's motion to preclude as to Scott's qualifications.

### 3. As to the Reliability and Helpfulness of Scott's Opinion.

Although the Defendant separately argues that Scott's opinion is unsupported by sufficient facts or data, without an underlying methodology or principle, and unduly prejudicial, these arguments all essentially claim that his testimony is insufficiently reliable to qualify as expert testimony. The Court disagrees that these inadequacies warrant preclusion of his testimony. The Defendant has "not demonstrated that [his] methodology was so flawed so as to make [his] analysis fundamentally unreliable." *Jensen v. Cablevision Sys. Corp.*, 372 F. Supp. 3d 95, 117 (E.D.N.Y. 2019).

"In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos*, 303 F.3d at 267. "The judge should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions." *In re Paoli*, 35 F.3d at 746.

Starting with the Defendant's contention that Scott's opinion is unsupported by sufficient facts or data, "[a]s a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Chill v. Calamos Advisors LLC*, No. 15-cv-1014,

2019 WL 5067746, at *25 (S.D.N.Y. Oct. 9, 2019). Similarly, the Defendant's argument that Scott's testimony is self-contradictory, at least based on the inconsistencies identified, is not sufficient to warrant preclusion. *See In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 174 (S.D.N.Y. 2018) (rejecting arguments that expert opinions were "speculative, internally inconsistent, and contradicted by the evidence"); *In re Fosamax Prod. Liab. Litig.*, 924 F. Supp. 2d 477, 496 (S.D.N.Y. 2013) ("As with any witness, inconsistencies in an expert witness's testimony do not implicate Daubert, but rather are properly addressed during cross examination.").

Next, as to the Defendant's claim that Scott fails to articulate a reliable principle or methodology, the "test for reliability of expert testimony is flexible, especially in cases where the expert's knowledge is non-scientific and based on his experience." *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 49–50 (S.D.N.Y. 2016). Scott's bases his assessments on his professional experience as a marine surveyor. "It is axiomatic that 'an expert might draw a conclusion from a set of observations based on extensive and specialized experience.'" *Chill*, 2019 WL 5067746, at *26 (quoting *Kumho Tire Co.*, 526 U.S. at 156, 119 S.Ct. 1167). The Defendant's disagreement about whether Scott's background knowledge is sufficient to support his conclusions go to weight to be assigned to his testimony, not its admissibility. *See Clarke v. LR Sys.*, 219 F.Supp.2d 323, 333 (E.D.N.Y. 2002) ("Disputes about ... faults in an expert's decision to use a particular methodology, or the lack of textual authority for an expert's opinion 'go to the weight, not the admissibility of his testimony.")

Finally, the Defendant's argument that Scott's testimony would be unduly prejudicial, for the most part, merely rehashes its previous two arguments. The Court agrees that there are certain aspects of Scott's expert report that might stray beyond the permissible limits of expert

testimony, such as his supposedly better-than-average ability to assess the truthfulness of individuals. However, these aspects of Scott's expert report do not pertain to the Court's adjudication of the Defendant's summary judgment motion. The Defendant has not established that these flaws are so significant to make the prejudice of inclusion outweigh the probative value of Scott's testimony. *See DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, No. 11-cv-0564, 2019 WL 1515231, at *11 (E.D.N.Y. Feb. 21, 2019) (denying motion to preclude expert testimony under Rule 403). They are more appropriately grounds for a motion *in limine*, rather than bases for wholesale preclusion.

Therefore, the Court denies the Defendant's motion to preclude as to the reliability of Scott's proffered testimony.

**B. AS TO THE MOTION FOR SUMMARY JUDGMENT.**

As the Court will explain, there is no genuine dispute of material fact as to either of the Plaintiff's claims. The Court will address the breach of contract claim first, and then turn to the Plaintiff's claim under the New York Insurance Law.

**1. The Legal Standard.**

Fed. R. Civ. P. 56(a) provides that a court may grant summary judgment when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

"A genuine issue of fact means that 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "Where the moving party demonstrates 'the absence of a genuine issue of material fact,' the opposing party must come forward with specific evidence demonstrating the existence of a

genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "The evidence of the party opposing summary judgment is 'to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" *Wright*, 554 F.3d at 266 (parenthetically quoting *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996)). However, to defeat a motion for summary judgment, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010).

"When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

**2. As to the Breach of Contract Claim.**

The Plaintiff claims that the Defendant breached its contractual obligation to insure him against loss or damage to the Vessel by denying him coverage for the February 23, 2015 incident. In response, the Defendant contends that such loss was not covered by the Policy due to the Plaintiff's breach of the Policy's lay-up warranty and his failure to winterize the Vessel. The lay-up warranty provides that:

> You expressly warrant that you will lay-up your yacht for the period of time as shown in the declarations. The warranty applies to all insureds.
>
> During the lay-up period, your yacht must be maintained for the conditions reasonably expected during the lay-up. In addition, your yacht cannot be used for any boating activities or as living quarters during the lay-up period.

ECF 48-1 at 37. The Policy defines "lay-up" as "taking your yacht out of active service and decommissioning it for the period of time as shown in the declarations. Lay-up can include either

13

storage on land or afloat." *Id.* at 35. In addition, the Policy's general exclusions explain that the Defendant does "not cover loss of damage caused by or resulting from . . . [t]he insured's failure to property winterize the yacht or dinghy in accordance with the manufacturer's specifications or customs in the area." *Id.* at 39.

The Court applies New York law to alleged breaches of marine insurance policies. *See Gelb v. Auto. Ins. Co. of Hartford, Conn.*, 168 F.2d 774, 776 (2d Cir. 1948). New York law generally construes insurance contracts liberally in favor of the insured, but "where the provisions of the policy are clear and unambiguous, they must be given their plain and ordinary meaning." *Government Employees Ins. Co. v. Kligler*, 42 N.Y.2d 863, 864, 397 N.Y.S.2d 777, 366 N.E.2d 865 (1977). Further, "[w]hether a vessel is laid up during the time warranted in a marine insurance policy depends upon local custom." *Goodman v. Fireman's Fund Ins. Co.*, 600 F.2d 1040, 1042–43 (4th Cir. 1979); *accord Gelb*, 168 F.2d at 775. When local customs include winterizing a vessel, failure to winterize a vessel consistent with those customs constitutes a breach of a lay-up warranty. *Gelb*, 168 F.2d at 775 (explaining that "[t]he evidence of custom which was introduced by the defendant tended to show that" a lay-up warranty "meant that the owner should put his boat up permanently in some unexposed place and with care for the protection of both the boat and her equipment"); *Goodman*, 600 F.2d at 1043 ("The district court found, and its finding is not clearly erroneous, that it is the custom in the Chesapeake Bay region at least to close the sea valves as part of the winterizing program. Since plaintiff failed to perform these steps, the vessel was not laid up as warranted in the policy"); *N.H. Ins. Co. v. Dagnone*, 394 F. Supp.2d 480, 488 (D.R.I. 2005) ("Because Dagnone had not completed winterization of the vessel at the time of the accident, the vessel was not "laid up and out of commission" as required by the Yacht Policy.").

In the Court's view, the Plaintiff breached the lay-up warranty by failing to fully winterize the Vessel, precluding him from recovering for the losses he suffered. It is undisputed that the Plaintiff never decommissioned the Vessel's systems, running the engine periodically during the lay-up period and failing to fully winterize those systems. The Plaintiff disagrees that this constitutes a breach of the lay-up warranty. He argues that the Policy contained no express prohibition against operating the Vessel's engine during the lay-up period and that he only did so as part of his efforts to winterize the Vessel consistent with local customs. But the Plaintiff presents no worthwhile evidence that his method of winterization actually comported with the customs of the area.

The Plaintiff primarily relies on Scott's expert testimony. Scott cites a conversation with the Plaintiff about his own winterization practices and observations on "what appears to be local custom." ECF 55-1 at 7. The entirety of his assessment of local customs is as follows:

> the commercial vessels in Captree Boat Basin at Captree State Park, which is across the Great South Bay from Mr. Clark's home are examples of local fishing boats which are winterized by similar methods. Mr. Clark's boat may have been a pleasure vessel but in many ways, it was more closely watched than those commercial vessels.

*Id.* This analysis amounts to little more than a conclusory assertion that the Plaintiff complied with local customs. He provides no evidence that the vessels cited in fact use the same methods as the Plaintiff, such as, corroborating documents, investigations into those vessels, or an explanation of how his professional experience would avail him of such knowledge. Even though the Court found Scott's testimony admissible, his *ipse dixit* is insufficient to establish a genuine dispute over a material fact. *See Simmons v. United States*, 88 Fed. Appx. 435, 437–38 (2d Cir. 2004) (expert's conclusory statement that physician's actions fell below the standard of care was "rightly regarded by the district court as insufficient to raise a genuine issue of material fact");

*Kelsey v. City of N.Y.*, No. 03-cv-5978, 2007 WL 1352550, at *5 (E.D.N.Y. May 7, 2007) ("Conclusory affidavits, even from expert witnesses, do not provide a basis upon which to grant or deny motions for summary judgment.").

On the other hand, the Defendant relies on the expert testimony of Mike Acebo ("Acebo"), who has 34 years of experience in boat construction, repair and marina management. Acebo explained that running the engines periodically and heating the interior cabin of a boat with electrical space heaters defies local custom for similar vessels:

> Importantly, Mr. Clark's use of electric space heaters onboard the vessel was not a proper method of winterizing/decommissioning the vessel and/or its systems and is directly contrary to local custom. In fact, local custom expressly prohibits the use of space heaters during winter storage (including during wet storage) due largely to the risk of fire. Additionally, as a practical matter electric space heaters placed inside of the cabin would not be particularly effective in heating the vessels systems, including its AC system, that are located below the waterline. Also, it is entirely predictable that at some point during the Long Island winter lay-up season that shore power will be lost, which is precisely what occurred in this case. Put simply, the use of space heaters in lieu of proper winterization of the vessel was a poorly conceived plan.

ECF 50-1 at 4. Whereas Scott only asserts what "appears" to be local custom, Acebo specifically describes his experience laying up and winterizing hundreds of boats in Suffolk County each winter, *id.* at 1, 3, such that the evidence supporting his assessment (the boats he personally laid up) is readily apparent. Accordingly, Acebo's report is entitled to significantly more probative value.

Even were Scott to provide evidence regarding the winterization practices of the vessels he described, it would not support the conclusion that the Plaintiff complied with local custom. Scott's expert report lacks any explanation of why the Vessel, a 34-foot fiberglass pleasure boat, should be compared to 65-foot steel commercial fishing vessels. The sheer difference in size and function of the two types of vessels makes the latter an inappropriate benchmark for establishing

local customs regarding the former. *See Eamotte v. Employers Commercial Union Ins. Co. of Am.*, 49 A.D.2d 758, 759, 372 N.Y.S.2d 712 (1975) ("[T]he criteria to be applied in determining whether the plaintiff complied with the warranty is whether the action taken by him [the insured] conforms with the well-established local custom and practice as to laying up similar vessels in the particular area where the yacht was kept."); *Wigle v. Aetna Cas. & Sur. Co.*, 177 F. Supp. 932, 934 (E.D. Mich. 1959) ("Whether a boat is 'laid up and out of commission' during the time warranted in a marine insurance policy depends upon whether its condition conforms with the well established local custom and practice as to laying up similar vessels in the particular area where the damage to the boat occurred.").

Scott makes a similar criticism of Acebo's report. According to Scott, Acebo describes local custom in Greenport, which is 50 miles away, with more open water, and a vastly different coastal environment. Scott's assertion is belied by the fact that he repeatedly conceded during his deposition that the Plaintiff's winterization technique was not the method traditionally used in the area. ECF 55-2 at 127:2–8 ("Q. Do you think he spelled out in his opinion an acceptable way under the manufacturer's guidelines as to how to winterize an A/C system? A Sure. I mean, especially for a normal run-of-the-mill system. That's the way most marinas do it."), 140:11–19 ("What is local custom in Suffolk County for laying up an air conditioning system on a boat such as Mr. Clark's for the winter months? A. Given normal circumstances, like if you were just going to walk away from your boat and it was in the water, I would agree with you that you should put antifreeze in the system."), 165:2–7 ("Q At least some of the Captree commercial boats you described were winterized in a different way than Mr. Clark? A A traditional way. How about that?"), 165:22–166:5 ("Q . . . You used the word no traditional lay-up or nontraditional winterization. Is that an accurate way to describe Mr. Clark's situation? A. I would say so, yes."),

178:4–11 ("Q Is it fair to say that the local custom with respect to pleasure yachts is to winterize A/C systems during the winter months? A If it's a live-aboard and they are using the reverse cycle for the air conditioning, then no, but I would say normally yes.").

Based on this testimony, it is apparent that Scott concurs with Acebo's articulation of local custom. He just won't fully admit to the same specific wording, most likely in an attempt to preserve the Plaintiff's claim. Consequently, the Court finds the fact of the Plaintiff's non-compliance undisputed, even though there is a surface-level battle of the experts.

The Plaintiff also attempts to establish local custom with an affidavit describing his own practices and citing "countless" unnamed "neighboring boat owners" who shared those practices. ECF 57 ¶ 26. Putting aside that both experts in this case disagree with the Plaintiff's assertion, his affidavit is conclusory and wholly unsupported by evidence. The Plaintiff cannot establish local custom—which inherently relates to the behavior of third-parties—through his own subjective practices. As for the hypothetical neighbors conjured by the Plaintiff, he fails to provide corroborating testimony from these neighbors or any documentation illustrating the truthfulness of his description. Courts routinely reject self-serving affidavits of this sort as bases for establishing a genuine dispute of material fact. *See Pressley v. City of New York*, No. 11-cv-03234, 2016 WL 1271480, at *3 (E.D.N.Y. Mar. 31, 2016) ("[A] self-serving affidavit that merely reiterates conclusory allegations in affidavit form and is . . . insufficient to preclude summary judgment."); *Petrisch v. HSBC Bank USA, Inc.*, No. 07-cv-3303, 2013 WL 1316712, at *10 (E.D.N.Y. Mar. 28, 2013) ("[I]t is well established that a self-serving affidavit that merely reiterates conclusory allegations in affidavit form is insufficient to preclude summary judgment.") (collecting cases).

The Plaintiff argues that the Defendant cannot rely on his failure to fully winterize the Vessel to disclaim coverage, because it was not the proximate cause of his loss. However, under New York law "proof of a causal relation is not required where there has been such a breach of a warranty in a marine policy." *Gelb*, 168 F.2d at 776 (affirming denial of coverage where the claimant breached the lay-up warranty); *Cunningham v. Ins. Co. of N. Am.*, 521 F. Supp. 2d 166, 170–71 (E.D.N.Y. 2006) (same).

The Plaintiff also argues that the Policy is ambiguous, and should be construed in his favor, because it contains no express prohibition against winterizing the Vessel in the manner he chose. However, "[p]arties are presumed to contract with reference to general customs and usages which explain the specific meaning of a term used and personal knowledge of the customary meaning need not be had by the parties to the contract." *Gelb*, 168 F.2d at 775 (interpreting a lay-up warranty). Thus, the fact that the Plaintiff chose a non-traditional winterization method for the area suffices to breach the warranty, notwithstanding the lack of a specific provision barring use of electrical space heaters to warm the Vessel's interior.

In sum, the Plaintiff's argument is that he complied with the lay-up warranty because he did not pilot the Vessel during the lay-up period. As another court explained, that interpretation relies on an untenable definition of a lay-up:

> It is true that Dagnone was not taking the yacht out for a brisk December cruise on the night it was damaged, however, the vessel was still fully operable. The yacht was still "being used" in the sense that it was in the water, having just been motored to Hinckley, and awaiting hauling out, rather than being "laid up and out of commission," as required, i.e., being "inoperable." To require some higher degree of use for the exclusion to apply would be contrary to the unambiguous meaning of the provision and would also defeat its clear intent: to encourage owners not just to stop using their boats during the winter, but to take affirmative steps to winterize their boats so that they are "laid up and out of commission." Thus, we find that the policy's exclusions clause is susceptible of only one reasonable interpretation: the policy will not cover losses during the specified months if the boat is not "laid up and out of commission."

19

*New Hampshire Ins. Co. v. Dagnone*, 475 F.3d 35, 38 (1st Cir. 2007).

Therefore, the Court finds no genuine dispute as to any material fact regarding the Plaintiff's breach of contract claim.

**3. As to the New York Insurance Law Claim.**

N.Y. Ins. Law § 2601 prohibits insurers from engaging in "unfair claim settlement practices," and specifies various actions that constitutes such unfair practices. N.Y. Ins. Law § 2601(a). "Although § 2601 makes the covered acts illegal, it does not allow for a private cause of action based on those acts." *Nick's Garage Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 126 (2d Cir. 2017). Notably, the Plaintiff never attempts to argue that he, in fact, possesses a right to bring a private cause of action. Therefore, the Court finds no genuine dispute as to any material fact regarding the Plaintiff's New York Insurance Law claim.

### III.  CONCLUSION

For the foregoing reasons, the Court denies the Defendant's motion to preclude, grants the Defendant's motion for summary judgment dismissing the Complaint, and denies the Defendant's motion to bifurcate as moot. The Court hereby dismisses the Complaint with prejudice. The Clerk of the Court is respectfully directed to close this case.

It is **SO ORDERED**:
Dated: Central Islip, New York
January 29, 2020

   /s/ Arthur D. Spatt
ARTHUR D. SPATT
United States District Judge